IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| DAVID HAMMERS, § | |
| § | |
| Plaintiff, § | |
| v. § | Case No.  3:13-CV-3659-M-BK |
| § | |
| THE CITY OF DALLAS, et al., § | |
| § | |
| Defendants. § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**

Pursuant to *Special Order 3*, this case has been referred to the undersigned for pretrial management.  The Court now considers Defendant City of Dallas's *Motion for Summary Judgment*.  Doc. 45.  For the reasons that follow, it is recommended that the motion be **GRANTED**.

**I.    PROCEDURAL HISTORY**

In September 2013, Plaintiff filed a *pro se* complaint against (1) the City of Dallas ("the City"); (2) Mike Rawlings, the City's mayor; (3) James Martin, the City's Director of Code Compliance Services; (4) Anita Childress, Chair of the City's Civil Service Board; and (5) Patricia Marsolais, Director of the City's Civil Service Board.  Doc. 3 at 1.  Plaintiff raised various causes of action relating to his failure to get hired by the City for either an Inspector II or an Inspector III position, including claims of race, sex, and age discrimination, breach of contract, due process violations, and negligence.  Doc. 3 at 3-6.  As relevant here, the Court previously dismissed Plaintiff's due process, breach of contract, and negligence claims against the City.  Doc. 39; Doc. 41.  The City now moves for summary judgment on Plaintiff's remaining claims of disparate impact and discriminatory treatment based on his race (white), sex (male), and age (55).  Doc. 45.

**II.     FACTS**

In connection with its summary judgment motion, the parties submitted evidence which reveals the following:  Plaintiff applied for an Inspector III position in the City's Code Department on October 1, 2012.  *See* List of Applications for Qualified Applicants, Doc. 47-8 at 1; Pl.'s Inspector III Application, Doc. 47-9 at 1-8.  Plaintiff was not selected for an interview, which he believed was due to his sex, race, and age based on "the end result . . . who was actually interviewed."  Pl.'s Dep., Doc. 47-24 at 15, 27-28.  However, other evidence indicates that Plaintiff was not on the register of eligible candidates in October, which is when Constance Reese, a manager in the Department of Code Compliance Services, selected candidates to interview.  *See* Register of Eligibles for Inspector III, Doc. 47-21 at 10-13; Reese Decl., Doc. 47-27 at 1.  All of the interviews for the Inspector III vacancies were scheduled for November 26 and November 27, 2012.  *See* Reese Decl., Doc. 47-27 at 3; Inspector III Interview Schedules, Doc. 47-11 at 1-2.  Plaintiff was not officially added to the list of eligible applicants until November 27, 2012, but the interviews were concluding that day.  Pl.'s Dep., Doc. 47-24 at 33-37; Reese Decl., Doc. 47-27 at 2-3.

Reese also attested that the Code Department wanted to promote to Inspector III only City employees with code experience who also possessed a valid Texas Code Enforcement Officer Certification, and she limited interviews to candidates who fit that description.  *See* Reese Decl., Doc. 47-27 at 2-3.  Plaintiff did not have his Code Enforcement Officer Certification nor has he ever been employed as a code inspector.  Pl.'s Dep., Doc. 47-24 at 57-59; Pl.'s Inspector III Job Application, Doc. 47-9 at 1-8.  Every person who was interviewed for the Inspector III position and ultimately hired had the credentials that Plaintiff lacked.  *See* Reese Decl., Doc. 47-27 at 3.  Of the six people that were hired for the Inspector III positions, one was

white, two were men, and three were over the age of 40.  *See* Reese Decl., Doc. 47-27 at 3; List of Individuals Hired for Inspector III, Doc. 47-21 at 10.  One of the people hired as an Inspector III, Bruce Benedict, was a 60-year-old white male.  *See* List of Individuals Hired for Inspector III, Doc. 47-21 at 10; Pl.'s Dep., Doc. 47-24 at 41.

As to the Inspector II position, Plaintiff submitted an application to the Code Department in September 2012.  *See* List of Applications for Qualified Applicants, Doc. 47-8 at 4.  Reese selected Plaintiff and 27 other applicants to interview for 16 vacant Inspector II positions.  *See* Reese Decl., Doc. 47-27 at 3-4; Inspector II Interview Schedules, Doc. 47-11 at 3-5.  Venetia Barber ("Barber"), a City employee who had been working as an Inspector II on a special assignment for the prior two years, was among those selected for an interview.  *See* Reese Decl., Doc. 47-27 at 3-4; Inspector II Interview Schedule, Doc. 47-11 at 3.  After the interviews were concluded, Reese ranked the candidates based on how the four interviewers had graded their responses to the interview questions.  *See* Reese Dep., Doc. 47-17 at 25-26.  The City then extended job offers to candidates, starting from the top of the list and working its way down the list until coming to Plaintiff's name, which was the last available job opening.  *See* Reese Dep., Doc. 47-17 at 28-29.  The two decisionmakers, who are both African-American females, then skipped over Plaintiff's name, as well as that of four other people, and extended a job offer to Barber, an African-American female, who was hired even though she was ranked significantly lower by the interviewers than Plaintiff.  *See* List of Individuals Hired for Inspector II, Doc. 47-19 at 13; Reese Decl., Doc. 47-27 at 4-5; McHenry Grievance Hearing Testimony, Doc. 47-17 at 115-17.  This was an exception to the normal process which was to go straight down the list of interviewees and hire them in the order they were ranked.  *See* Reese Grievance Hearing Testimony, Doc. 47-24 at 48-49.

Reese testified that she was told to hire Barber because Barber had been working as an Inspector II in the Code Department for approximately two years and already had obtained her Code Enforcement Officer Certification. *See* Reese Decl., Doc. 47-27 at 4-5; Reese Grievance Hearing Testimony, Doc. 51-6 at 2. Reese averred that the decision conserved financial and personnel resources associated with hiring and training someone new to the code enforcement field, such as Plaintiff. *See* Reese Decl., Doc. 47-27 at 5. Moreover, the Code Department was pleased with Barber's performance during her special assignment and decided to hire her instead of the next person on the list (Plaintiff) even though she did not rank highly during her interview for the Inspector II job. *See* Reese Decl., Doc. 47-27 at 4-5; Reese Grievance Hearing Testimony, Doc. 47-17 at 29-30. Reese testified that she did not know Plaintiff's race, sex, or age when she made her recommendations for hire. *See* Reese Grievance Hearing Testimony, Doc. 47-17 at 49-50. In sum, 16 individuals were hired for the Inspector II positions. *See* Reese Dep., Doc. 47-17 at 24. Five were men, two were white females, two were over the age of 55, and ten were over the age of 40. *See* Reese Dep., Doc. 47-17 at 24-25, 30.

Plaintiff submitted as evidence the City's discovery responses that seemingly indicate that, of 19 City of Dallas hiring managers, none of them had been formally trained in how to objectively recruit, interview, or hire employees. Doc. 51-3 at 3-7. Plaintiff also personally compiled statistics that he attests demonstrate disparate impact against white males in the City's hiring for the Inspector III position because 67% of those hired were females, 50% were African-American, and 33% were Hispanic. Doc. 47-20 at 7; Doc. 47-22 at 3. Additionally, Plaintiff calculated statistics suggesting that many of the applicants in the protected age group had more experience and better credentials than the applicants under age 40 who were hired. Doc. 47-22 at 3; Doc. 50 at 14-15. With regard to the Inspector II position, Plaintiff compiled charts which he

4

states indicate that of the 16 vacancies filled, 69% were females, 69% were African-American, 13% were Hispanic, and no job offers were made to white males. Doc. 47-18 at 9-10.

Plaintiff additionally has submitted his Equal Employment Opportunity Commission ("EEOC") Intake Questionnaire dated May 20, 2013, and supplemental documents that he submitted in connection with the same, namely his complaint to the City's Civil Service Department related to the Inspector II and III jobs, his position statements, and his statistical analyses as to both jobs. Doc. 51-1 at 2-27.

**III.   APPLICABLE LAW**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A party moving for summary judgment has the initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.  Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotes omitted).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* (citation omitted). Unsubstantiated beliefs are not competent summary judgment evidence. *de la O v. Housing Authority of City of El Paso*, 417 F.3d 495, 502 (5th Cir. 2005).  Nevertheless, when ruling on a

motion for summary judgment, the court is required to view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in favor of the nonmoving party. *Matsushita*, 475 U.S. at 587.

Title VII and the ADEA provide, in relevant part, that an employer may not "fail or refuse to hire" an applicant for employment "because of" the applicant's race, sex, or age. 42 U.S.C. § 2000e-2(a)(1) (race/sex); 29 U.S.C. § 623(a)(1) (age). The non-discrimination provisions of Title VII and the ADEA permit plaintiffs to pursue discrimination claims under two distinct theories: disparate impact and disparate treatment. *See, e.g.*, *Munoz v. Orr*, 200 F.3d 291, 299 (5th Cir. 2000); *see also Smith v. City of Jackson*, 544 U.S. 228, 232 (2005) (holding that the ADEA permits recovery on a disparate impact theory). Under the disparate impact theory of discrimination, a plaintiff is not required to prove that an employer had the intent to discriminate. *Munoz*, 200 F.3d at 299. Rather, a plaintiff must identify a facially neutral employment practice that has a discriminatory effect upon a protected class. *See* 42 U.S.C. § 2000e-2(k)(1)(A)(i); *Munoz*, 200 F.3d at 299-300. The evidence in such cases focuses on the degree of statistical disparity between protected and non-protected workers in regard to employment or promotion. *Munoz*, 200 F.3d at 300; *see also Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 994 (1988) ("Once the employment practice at issue has been identified, causation must be proved; that is, the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group.").

By contrast, "[d]isparate-treatment cases present the most easily understood type of discrimination . . . and occur where an employer has treated a particular person less favorably than others because of a protected trait." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) (internal

quotations, citations, and modifications omitted). A plaintiff proceeding on a disparate treatment theory of discrimination must provide sufficient evidence to create a genuine issue of material fact as to whether: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the position; (3) the plaintiff was not hired for the position; and (4) after the defendant declined to hire the plaintiff, the position remained open or someone outside of the protected class was selected to fill the position. See Davis v. Chevron U.S.A., Inc., 14 F.3d 1082, 1087 (5th Cir. 1994) (Title VII); Lindsey v. Prive Corp., 987 F.2d 324, 326-27 (5th Cir. 1993) (ADEA).

IV.   **ARGUMENTS AND ANALYSIS**

   A. *Disparate Impact Claim*

The City first argues that it is entitled to summary judgment on Plaintiff's disparate impact claim because he did not raise that claim in the Charge of Discrimination that he filed with the EEOC, and his Charge of Discrimination could not reasonably lead to an investigation of a disparate impact claim. Doc. 46 at 13-16. Alternatively, the City asserts that Plaintiff cannot demonstrate a *prima facie* case of disparate impact discrimination because (1) he has not identified a sufficiently specific neutral practice or policy of the City that has a disparate impact on people of the protected class; and (2) he has not shown that any City policy or practice actually caused the exclusion of applicants from jobs because of their membership in a protected group. Doc. 46 at 16-19. The City further contends that Plaintiff's self-prepared statistical analysis is unreliable and cannot be used to establish causation because he is not qualified to offer expert statistical analysis, his methodology is unreliable, and the City's expert witness has concluded that there was no disparate impact.[1]  Doc. 46 at 20-25.

---

[1] The Court notes that the City's expert witness erroneously used the dates February 27, 2013-June 15, 2013 as the dates during which the discrimination took place. Doc. 47-15 at 2. In

Plaintiff responds that he did in fact exhaust his disparate impact claim because he raised it in his EEOC Intake Questionnaire and the pages he attached thereto, and he discussed that claim with the EEOC investigator once he was able to meet with her. Doc. 50 at 8-10. Further, Plaintiff claims he has identified two sufficiently specific neutral practices of the City: (1) the lack of policies and procedures that the City uses to objectively screen job applicants; and (2) the City's lack of a training procedure to guide hiring managers in the recruitment, interview, and hiring process. Doc. 50 at 10-12. Plaintiff additionally maintains that his statistical calculations are correct, and he claims that he will call the City's statistics expert as a witness to establish the causation element of his *prima facie* case. Doc. 50 at 13.

The City replies that Plaintiff has not demonstrated a neutral policy or procedure merely by claiming that the City lacks such. Doc. 52 at 11. Additionally, the City notes that Plaintiff has not denied that he is not competent to offer expert statistical evidence. Doc. 52 at 12. The City argues that consequently, Plaintiff's purported intent to rely on the defense expert, who has already opined that there was no statistically significant impact on whites or men in the hiring process, means that the undisputed evidence establishes that there was no disparate impact upon a protected class of individuals. Doc. 52 at 12.

As an initial matter, the Court should reject the City's argument that Plaintiff failed to exhaust his disparate impact claim. In *Federal Express Corp. v. Holowecki*, 552 U.S. 389 (2008), the Supreme Court held that a claimant's EEOC Intake Questionnaire, together with a six-page affidavit asking the EEOC to take action against the employer constituted a filing for purposes of Title VII. 552 U.S. at 408. In *Clark v. Kraft Foods, Inc.*, 18 F.3d 1278, 1280 n.9 (5th Cir. 1994), the Court of Appeals for the Fifth Circuit noted that a civil action may

---

actuality, the events in question occurred between September 2012 and January 2013. Accordingly, the City's statistical analysis is not as useful as it could have been.

encompass claims stated in the EEOC charge, claims developed during the course of an investigation of that charge, and claims included in what the EEOC would reasonably be expected to investigate on account of the charge.

In the present case, Plaintiff appears to have mailed his Intake Questionnaire and various attachments on May 20, 2013. Doc. 51-1 at 2. The Intake Questionnaire mentions a disparate impact claim, cites to statistical evidence that Plaintiff will use to support that claim, and that the claim is based on the respondents not following the City Charter, City Code, and personnel rules resulting in discrimination against people in the protected group. Doc. 51-1 at 4. His attached position statements and statistical data also provide notice of Plaintiff's disparate treatment claim. *See* Doc. 51-1 at 12-14, 16, 22-23, 26-27. Collectively, this is sufficient to bring Plaintiff's disparate impact claim to the attention of the EEOC investigator such that the EEOC would reasonably be expected to investigate that charge. *Clark*, 18 F.3d at 1280 n.9.

Turning to the merits, the City argues that Plaintiff is not qualified to conduct expert statistical analysis in connection with his disparate impact claims. Doc. 46 at 21. Plaintiff does not seriously dispute this. *See* Doc. 47-24 at 70-71 (Plaintiff testifying that he holds no degrees or certifications in statistics or any other mathematical field, has never been compensated for any such analysis, and has never published any articles or books on the subject). To establish a disparate impact claim, however, Plaintiff must necessarily rely heavily on statistical proof. *See, e.g.*, *Munoz*, 200 F.3d at 300. In short, he must show that the policy or practice in question discriminated against him and others similarly situated within a protected group in a pattern that is shown to be significantly discriminatory or markedly disproportionate. *See Banks v. E. Baton Rouge Parish Sch. Bd.*, 320 F.3d 570, 579 (5th Cir. 2003); *Stout v. Baxter Healthcare Corp.*, 282 F.3d 856, 860 (5th Cir. 2002).

Neither the Court nor the City is obligated "to assume that plaintiffs' statistical evidence is reliable." Watson, 487 U.S. at 996. If the basis for Plaintiff's statistical evidence is so unreliable that no reasonable expert could base an opinion on that data, the opinion may be excluded in assessing the City's summary judgment motion. Berry v. Armstrong Rubber Co., 989 F.2d 822, 824 (5th Cir. 1993). Therefore, if Plaintiff's statistical evidence is insufficient to prove a *prima facie* case of disparate impact, the Court can summarily dismiss such claims. See Lopez v. Laborers Int'l Union, 987 F.2d 1210, 1214-16 (5th Cir. 1993) (upholding the dismissal of a case on summary judgment where plaintiff's disparate impact/treatment case was founded on statistics that utilized an irrelevant point of comparison, resulting in "absolutely inadequate" figures based on "completely inappropriate data").

Plaintiff does not argue that he is qualified to conduct the proper statistical analysis, nor has he designated his own expert witness on that subject. Additionally, the fact that Plaintiff himself calculated the statistics from data he personally collected is troublesome. Munoz, 200 F.3d at 301-02 (holding that reliance on plaintiff's compilation of data gave rise to "common-sense skepticism"). Moreover, Plaintiff likely believed he had been discriminated against before conducting his statistical analysis as well, further undermining the reliability of his opinion. See Viterbo v. Dow Chemical Co., 826 F.2d 420, 423 n.2 (5th Cir. 1987) (stating that an expert who forms his opinion before conducting any research is biased and lacking in objectivity which could be a ground for excluding him as a witness due to lack of reliability).

Aside from these broader concerns, a review of Plaintiff's statistical evidence reveals numerous flaws in his numbers. First, with regard to the Inspector II position, Plaintiff did not include all of the qualified applicants as the starting point in making his calculations. *Compare* Doc. 47-8 at 3-4 (City data indicating that there were 76 qualified applicants referred for the

Inspector II position) *with* Doc. 47-18 at 9-10 (Plaintiff's data indicating 50 applicants for Inspector II position).  This is, in and of itself, sufficient to find that Plaintiff has not made out a *prima facie* case of disparate impact discrimination as to the Inspector II position.  *See* [Lopez, 987 F.2d at 1214, 1216](#) (upholding dismissal on summary judgment upon finding that plaintiffs had not proven a *prima facie* case of disparate impact discrimination when their expert witness used an inappropriate starting point for his calculations).

Additionally, Plaintiff's statistical data in regard to the Inspector II position does not identify or utilize the number of qualified applicants in the protected categories who actually applied for the positions at issue.  *Compare* Doc. 47-15 at 79-89 (City data indicating that 194 applicants who met the minimum qualifications applied for the Inspector II position); *with* Doc. 47-15 at 57-58 (Plaintiff's chart indicating 50 applicants for Inspector II position) *and* Doc. 47-23 at 3 (Plaintiff's "position statement" noting that there were 71 applicants for the Inspector II position).  Plaintiff's statistical data relating to the Inspector III position suffers from similar flaws.  *Cf.* Doc. 47-15 at 91-101 (City data indicating that 168 qualified applicants applied for the Inspector III position); Doc. 47-24 at 76-77 (Plaintiff testifying that his chart encompassing Inspector III applicants did not include all of the qualified applicants, he did not know how many applicants there were, and he did not know their gender or race).

Plaintiff further testified during his deposition that he concluded disparate impact had occurred with regard to the Inspector III position based on (1) the fact that fewer white people and men applied for the job as compared to other races and the female gender; (2) who was selected for interviews; and (3) the fact that three of the six people hired were African-American.  Doc. 47-24 at 71-73.  Additionally, as to numerous entries on his chart purporting to show age discrimination, Plaintiff acknowledged that he guessed at some of the applicants' ages based on

the year they graduated from high school.  Doc. 47-24 at 74-75.  In light of the fundamental flaws with Plaintiff's self-styled statistical data, the Court finds that his analysis should be excluded in assessing the City's summary judgment motion.  *Berry*, 989 F.2d at 824.  As a result, he cannot make out a *prima facie* case of disparate impact discrimination.  *See Lopez*, 987 F.2d at 1214, 1216.  His intent to utilize the City's expert witness at trial to shore up his own case cannot succeed because he must first survive summary judgment, and he cannot do so for the reasons stated.[2]  The City is entitled to summary judgment on this claim.  *Id.*

    B.  Disparate Treatment

        1.  Inspector III Position

The City argues that Plaintiff has not made out a *prima facie* disparate treatment claim because he cannot show that he was qualified for the Inspector III position as he did not have either previous code inspection experience or Code Enforcement Officer Certification.  Doc. 46 at 26-28.  Additionally, the City asserts that Plaintiff cannot demonstrate that the position he sought was awarded to someone outside of his protected class because, of the six candidates that were hired, three were over 40, one was white and age 60, and two were male.  Doc. 46 at 29-30.  Assuming, *arguendo*, that Plaintiff can establish a *prima facie* case, the City contends that it had a legitimate non-discriminatory reason for not granting Plaintiff an interview for the Inspector III position: the Code Department wanted to hire someone with prior experience as a code enforcement officer who already had a valid Code Enforcement Officer Certification.  Doc. 46 at

---

[2] It is not clear what Plaintiff would expect to gain from the City's expert as she concluded in her report that there were no statistically significant differences between the hiring rates based on gender or race for either the Inspector II or Inspector III positions.  Doc. 47-15 at 7-10.  No statistical analysis was undertaken by the expert based on age because no age data was provided to her.  Doc. 47-15 at 10.  Evidence submitted by the City in conjunction with this summary judgment motion indicates that (1) ten of the 16 hires for the Inspector II position were over age 40 (four were 50 or older), Doc. 47-19 at 13; and (2) three of the six hires for the Inspector III position were over age 40 (one was 60), Doc. 47-21 at 10.

30-31.  Finally, the city notes that Plaintiff could not have been interviewed because his name was not added to the list of eligible candidates until the last day that interviews for the Inspector III positions were taking place.  Doc. 46 at 31-32.

Plaintiff does not respond directly to the City's arguments, but asserts in passing that the Inspector III position was initially posted as an open position, meaning that both internal and external candidates were eligible for hire.  Doc. 50 at 13.  Liberally construing his response, he appears to be arguing that the City's requirement that eligible candidates have previous code inspection experience and certification was added later, which was discriminatory.  *See Haines v. Kerner*, 404 U.S. 519, 520 (1972) (providing that the courts should liberally construe *pro se* pleadings).  The City replies that Plaintiff has not attempted to demonstrate either that he was qualified for the Inspector III position or that, after the City declined to hire him, the position either remained open or someone outside Plaintiff's protected class was hired.  Doc. 52 at 13-14.

For essentially the reasons stated by the City, summary judgment is warranted on this claim.  As an initial matter, Plaintiff has not established a *prima facie* case of disparate treatment because he has not presented evidence demonstrating that there is a material factual dispute as to whether (1) he was qualified for the Inspector III position and (2) after the City declined to hire him, the Inspector III position remained open or someone outside of the protected class was selected to fill the position.  *See Gonzalez*, 43 F.3d at 670 n.3.  First, Plaintiff was not qualified for the Inspector III position because he did not have prior experience as a code enforcement officer and a valid Code Enforcement Officer Certification, both of which became job requirements as the selection process proceeded.  As the City correctly points out, its alleged violation of internal rules or policies and the addition of the extra job criteria do not suffice to show disparate treatment absent more.  *See Scales v. Slater*, 181 F.3d 703, 710 (5th Cir. 1999)

13

(holding that, in the absence of any inference that the narrowing of the job criteria was designed to eliminate members of the protected class, the defendant was "simply doing what any employer would do: whittling to a manageable number a group of qualified candidates for a single position.").

Even assuming that an inference of discrimination can be drawn from the addition of the additional criteria, Plaintiff's claim still fails because he cannot demonstrate that the Inspector III position remained open or that the persons who filled the positions were outside his protected class. Indeed, the evidence shows that one of the six candidates hired for the job was a white male who is older than Plaintiff. *See* List of Individuals Hired for Inspector III, Doc. 47-21 at 10; Pl.'s Dep., Doc. 47-24 at 41. Finally, it is undisputed that Plaintiff's name was not given to the person who was selecting interviewees until the last day of interviews, thus making it extremely unlikely that any further candidates would have been eligible to interview at that point. *See* Inspector III Interview Schedules, Doc. 47-11 at 1-2; Pl.'s Dep., Doc. 47-24 at 33-37; Reese Decl., Doc. 47-27 at 2-3. While this may have been an internal error in the processing of the job applications, there is no evidence in the record to suggest that it was based on Plaintiff's status as a member of a protected class. For the foregoing reasons, the City's summary judgment motion should be granted as to this claim.

      2. Inspector II Position

The City next asserts that Plaintiff cannot demonstrate that he was discriminated against with respect to the Inspector II position because, even assuming he can state a *prima facie* case of discrimination, the City had a legitimate non-discriminatory reason to not offer him the position and to offer it to Barber instead. Doc. 46 at 33. In particular, Barber already had been working in the Inspector II position for two years on special assignment, she had obtained her

Code Enforcement Officer Certification, and the Code Department had been pleased with her performance on the job even though she did not interview very well.  Doc. 46 at 33-34.  As a result, the City contends, by offering the job to Barber, the City conserved financial and personnel resources that would result if someone brand new to the code enforcement field, such as Plaintiff, was hired.  Doc. 46 at 33.  The City asserts that Plaintiff cannot show that the reasons for its actions are a pretext for discrimination especially in light of the fact that, the other people passed up in favor of Barber included a Hispanic male, an African-American female, a Hispanic female, and an African-American male.  Doc. 46 at 35.

     Plaintiff responds that the City violated its own custom and practice of extending offers of employment in the order in which the candidates were ranked when he and several others were passed over and Barber was given the Inspector II position.  Doc. 49 at 8-10; Doc. 50 at 16-17.  He contends that both decisionmakers are African-American females who maliciously discriminated against him due to his race, sex, and/or age, and he refutes that the City's decision was made to conserve resources.  Doc. 49 at 9-10; Doc. 50 at 17-19.  In support, he notes that candidate Anna Hall also was passed over in favor of Barber even though she has over three years of employment with the Code Enforcement Department and has a current Code Enforcement Officer Certification.  Doc. 49 at 11; Doc. 50 at 19-20.  Plaintiff also notes that an African-American female, Nadine Davis, was ranked above him and hired even though she was not certified as a Code Enforcement Officer, which he contends demonstrates that the City's actions were a pretext based on his status as a white male.  Doc. 50 at 20.

     Assuming that Plaintiff qualified for the position of Inspector II, he cannot overcome the City's legitimate, non-discriminatory reason for not hiring him.  In particular, he cannot overcome the fact that Barber had already been working in that position and her manager was

15

pleased with her work performance despite the fact that she did not interview well. Further, she had her Code Enforcement Officer Certification, which Plaintiff lacked. Plaintiff has provided nothing but conclusory assertions to counter the City's plausible explanation that this saved time and resources because there was no need to train Barber as there would be if Plaintiff, who lacked Barber's job experience and certification, was hired. Again, Plaintiff speculates about the motive of the two African-American female decisionmakers, but there is no factual basis for his suspicions as would be necessary to overcome summary judgment. Indeed, in passing over several other job candidates, the decisionmakers bypassed two other African-Americans, one of whom was female, a Hispanic female, and three people under the age of 40, all of whom scored higher than Barber during the interview process. Doc. 47-13 at 1; Doc. 47-15 at 105-11; Doc. 47-18 at 9. If the decisionmakers wanted to make their selection based on race, age and/or gender, they could have selected one of the other higher-ranking candidates. For the above reasons, the City is entitled to summary judgment on this claim.

## V.   CONCLUSION

For the foregoing reasons, the undersigned recommends that the Court **GRANT** the City's *Motion for Summary Judgment*. Doc. 45.

**SO RECOMMENDED** on May 27, 2015.

_____
RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE

16

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n, 79 F.3d 1415, 1417 (5th Cir. 1996)*.

_____
RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE